UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

NATHAN HUBLICK,

                    Plaintiff,                        Case No. 12-cv-14146

v                                       Honorable Thomas L. Ludington

COUNTY OF OTSEGO, ERIC PANDELL,
VANESSA HOGLE, and KENT HILLEY,

                    Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      This § 1983 action arose after Plaintiff Nathan Hublick was tased while incarcerated at Otsego County jail.  Hublick sued Officers Pandell, Hilley, and Hogle in their individual and official capacities for using excessive force in violation of the Fourteenth Amendment.  Hublick also sued Otsego County, claiming it maintained an unconstitutional taser policy and failed to adequately train and supervise jail personnel.  Defendants moved for summary judgment on the entirety of Hublick's claims.

**I**

      On March 15, 2010, Hublick was an inmate at the Otsego County Jail.  Resp. Ex. A at 38, ECF No. 33.  All parties agree that, after lunch, Officer Pandell removed Hublick from his four-man cell.  The parties also agree that Officer Hilley tased Hublick twice before placing him in a restraint chair.  However, the parties dispute the circumstances surrounding these events, and therefore each individual's version will be set forth below.

**A**

Hublick describes the events as follows: Around lunchtime, Hublick received a tray that was missing the main portion of his meal. Resp. Ex. A at 39. Hublick tried to get the guards' attention by hitting the cell door with his hands and feet a couple times. *Id.* at 40. When the guards did not immediately respond, Hublick sat down and watched television. *Id.* at 40.

About ten to fifteen minutes later, Officer Pandell entered the cell and told Hublick that he was being placed in the restraint chair. *Id*. at 41. When Hublick asked for an explanation, Officer Hilly responded that it was "for that stunt you just pulled" and then pointed his taser at Hublick. *Id.* at 42. Hublick remained seated on the bed, so Officer Pandell dragged Hublick out of the cell in a chokehold. *Id*.

While Officer Pandell was dragging him out of the cell, Hublick went limp in an attempt to "show[] the most submissive form I could think of, which was, you know, palms out and not resisting at all." *Id*. at 43. Officer Hilley then ran up and elbowed Hublick in the face, resulting in a black eye. *Id.* at 44, 45. Hublick fell down, and Officer Hilley tased him in the leg. *Id*. at 44. Hublick states that the he did not receive any warnings that he was about to be tased. *Id.* at 63.

Hublick lost consciousness after Officer Hilley tased him, and when Hublick came to, Hilley tased him again, this time on the left side of his torso. *Id.* at 44. Hublick lost consciousness again. Hublick woke up in the restraint chair with his hands cuffed behind him. *Id*. at 46. At some point during the incident, Officer Hilley threatened Hublick by stating "I'm going to light you up." *Id*. at 45.

After being placed in the restraint chair, Hublick requested medical help because he thought his hand was broken. *Id*. at 46. Officer Pandell, however, ignored Hublick's request. *Id.* at 47. After about two hours, Officers Pandell and Hilley returned Hublick to his cell. *Id*.

Hublick claims that that he never tried to run or escape during the incident, nor did he attempt to hit, punch, or kick the officers. *Id*. at 63.

**B**

According to Officer Pandell's version of events, Hublick was being disruptive by banging on his cell door. Resp. Ex. B at 19. When Pandell arrived at the cell, he saw that Hublick was "agitated" and "pacing." *Id*. at 30. Officer Pandell ordered Hublick to exit the cell, but Hublick refused. *Id.* at 28. After Pandell told Hublick to calm down, Hublick told Pandell to "[g]o ahead and shoot me." *Id*. at 31. At that point, Pandell had his taser pointed at Hublick.

When Officer Hilley arrived, Pandell holstered his taser and grabbed Hublick "around his neck under his arm." *Id.* at 32. Hublick then became "passive resistant" by continuing to ignore the officers' commands to exit the cell. *Id*. Pandell dragged Hublick into the cell corridor and left him sitting against the wall. *Id.* at 37. Pandell then went to retrieve the restraint chair located about 50 feet away.

After Pandell retrieved the restraint chair, Hublick refused to get up and sit in it, so Pandell tried to lift him up into it. *Id*. at 38. Hilley then tased Hublick twice. *Id*. at 44. Pandell claims that after the first tase, Hublick encouraged Hilley to tase him again. *Id.* After the second tase, the officers handcuffed Hublick and placed him in the restraint chair. *Id.* After about a half hour, the officers returned Hublick to his cell. *Id.* at 46.

**C**

According to Officer Hilley, he was monitoring the control center when Hublick began banging on his cell door.  Resp. Ex. C at 15.  Hilley watched as Officer Hogle and Pandell opened Hublick's cell door.  *Id.* at 16.  Hilley knew that Hogle was seven months pregnant, and he ordered her back to the control room so that she could avoid a situation where she may get assaulted.  *Id.* When Pandell entered the cell, Hublick began yelling "Fuck you, I'm not going." *Id.*

Hilley walked to Hublick's cell and let Pandell know that he was covered.  *Id.* at 21. When Hublick refused to get off his bed, Hilley saw Pandell drag Hublick out of the cell.  Hilley shut the cell door behind them. *Id.* at 26.

While Pandell retrieved the restraint chair, Hilley removed his taser from its holster and placed it against Hublick's shoulder.  *Id* at 28.  Hilley warned Hublick to stay still: "Nate, don't move.  If you move, I will tase you."  *Id.*  Later, when Hilley told Hublick to get into the restraint chair, Hublick refused and responded "Fuck you, I'm not going to get into the restraint chair." *Id.*  Hilley then gave a taser warning and tased Hublick.  *Id.*  After being tased, Hublick yelled "That taser ain't shit.  Do it again," and "Thank you, sir, may I have another?" *Id.*

After Hublick still refused to get into the restraint chair, Hilley tased him a second time. *Id.* at 33. Realizing that using the taser on Hublick "wasn't working," Hilley holstered the taser and helped Pandell lift Hublick into the restraint chair.  *Id.* at 34.

**D**

According to Officer Hogle, after she delivered a lunch tray to Hublick, he became "really upset" and was "yelling and ranting."  Resp. Ex. D at 28. Hogle told Hublick she would be back later.  *Id.*  Hogel then saw Pandell and Hilley walking towards Hublick's cell, and she

moved about six to eight feet away from the door.  Inside the cell, Hublick was "throwing his arms around, yelling, hollering, and bent out of shape."  *Id.* at 33.

Hogle watched as Pandell dragged Hublick out of the cell.  *Id.* at 37.  When Hublick refused to comply with Pandell's verbal commands, Hilley tased Hublick in the back.  After the first tase, Hublick began yelling "Thank you, sir, may I have another!"  *Id.* at 39.  About 15-30 seconds later, Hilley tased Hublick again.  *Id.* at 39.  Hogle then watched as Pandell and Hilley placed Hublick in the restraint chair.  *Id.* at 42.

## II

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted).  The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III

To prevail on his § 1983 claim, Hublick "must establish that a person acting under color of state law deprived [him] of a right secured by the Constitution or laws of the United States." *Smoak v. Hall*, 460 F.3d 768, 777 (6th Cir. 2006) (citing *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001)).  A defendant may assert "the defense of qualified immunity, which

shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* Indeed, "[i]n qualified immunity cases, the plaintiff bears this burden; he must show that the defendant is not entitled to qualified immunity." *Wysong v. City of Heath*, 260 F. App'x. 848, 852 (6th Cir. 2008).

When determining whether the allegedly injured party has met this burden, a court employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Smoak*, 460 F.3d at 777. A court may consider the steps in any order. *Pearson v. Callahan*, 555 U.S. 232, 236 (2009).

## A

First, the Court will determine whether the constitutional right was clearly established at the time of the violation. "If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Qualified immunity is proper unless "it would be clear to a reasonable officer" that his use of excessive force "was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

- 6 -

The facts alleged by Hublick, if believed, could establish violations of clearly established law.  The Sixth Circuit has held that "the right to be free from excessive force is a clearly established right for purposes of the qualified immunity analysis."  *Kostrzewa v. City of Troy*, 247 F.3d 633, 641 (6th Cir. 2001); *see also McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988) (gratuitous blow to the ribs of a handcuffed suspect who was not trying to escape); *Phelps v. Coy*, 286 F.3d 295, 301 (6th Cir. 2002) (continuing to beat a "neutralized" detainee).   "It is sufficiently obvious . . . that it would be objectively unreasonable for an officer to gratuitously cause additional pain to a nonviolent and, at most, passively resistant detainee while she is being restrained in a full control hold by two officers."  *Lustig v. Mondeau*, 211 F. App'x 364, 371-72 (6th Cir. 2006).

Even more specifically, the Sixth Circuit has held that "the gratuitous or excessive use of a taser would violate a clearly established constitutional right."[1]  *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008); *see also Vaughn v. City of Lebanon*, 18 F. App'x 252, 266 (6th Cir. 2001) (holding that the use of a chemical spray may be unconstitutional when there is no immediate threat to the safety of the officers or others); *Adams v. Metiva*, 31 F.3d 375, 386 (6th Cir. 1994) (holding that the use of mace on a compliant suspect is constitutionally unreasonable). Hublick's right to be free from excessive force was clearly established at the time of the incident.

**B**

Next, the Court must determine whether Defendant Officers violated Hublick's constitutional right to be free from excessive force.

"Section 1983 does not confer substantive rights; rather, it is only a means to vindicate rights already conferred by the Constitution or laws of the United States."  *Burgess v. Fischer*, 735 F.3d

---

[1] The *Landis* opinion held that the use of a taser is analogous to the use of pepper spray for the purpose of determining whether a right was clearly established.  *Landis*, 297 F. App'x at 463.

462, 472 (6th Cir. 2013). Excessive force claims can be raised under the Fourth, Eighth, and Fourteenth Amendments. *Id*. The amendment to be applied depends on the plaintiff's status at the time of the incident. *Id*. The Fourth Amendment's prohibition against unreasonable seizure bars excessive force against free citizens, while the Eighth Amendment's ban on cruel and unusual punishment bars excessive force against convicted persons. *Id*. When a citizen does not fall clearly into either category—for example, pretrial detainees—the Fourteenth Amendment's more generally applicable Due Process Clause governs to bar a governmental official's excessive use of force. *Id.*

As a pretrial detainee held in jail, Hublick is "protected under the Fourteenth Amendment, which provides that a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Thompson v. County of Medine*, 29 F.3d 238, 242 (6th Cir. 1994). The Sixth Circuit "has made clear that such detainees are thus entitled to the same Eighth Amendment rights as other inmates." *Id.* at 242; *see also Jackson v. Wilkins*, 517 F. App'x 311, 317 (6th Cir. 2013). Thus, Eighth Amendment analysis applies to excessive force claims by a pretrial detainee, albeit through the Fourteenth Amendment's Due Process Clause. *Thompson*, 29 F.3d at 242.

**i**

Hublick alleges that Defendants used excessive force by "forcefully and unnecessarily grabb[ing] him around the neck and dragg[ing]him from his cell. Defendants then unnecessarily tased Plaintiff multiple times, causing him to lose consciousness before handcuffing him and placing him in a restraint chair." Def.'s Resp. at 1.

The Eighth Amendment protects inmates from the unnecessary and wanton infliction of pain by correctional officers. *Whitely v. Albers*, 475 U.S. 312, 320 (1986). Officers are

permitted to use force reasonably "in a good-faith effort to maintain or restore discipline," but force is not to be used "maliciously and sadistically to cause harm." *Id.* at 313.

Not every "touch by a prison guard gives rise to a federal cause of action," however. *Id.* at 9. In fact, prison officials may use physical force in the form of tasers to compel obedience by inmates. *Drummer v. Luttrell*, 75 F. Supp. 2d 796 (W.D. Tenn. 1999) (citing *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992) (an officer's use of a stun gun and straight jacket to subdue the inmate's escalating and violent behavior did not violate the Eighth Amendment)). However, prison officials are not permitted to "maliciously and sadistically cause harm" to prisoners. *Id.*

"Officials confronted with a prison disturbance must balance the threat unrest poses . . . against the harm inmates may suffer if guards use force." *Combs*, 315 F.3d at 557. "Because prison officials must make their decisions in haste, under pressure, and frequently without the luxury of a second chance, we must grant them wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.*

In this case, it is undisputed that Officer Hilley tased Hublick twice. It is also undisputed that Hublick was not actively resisting commands and did not pose a security threat.

There are, however, several fact disputes regarding the particulars of the events that took place in Otsego County Jail. Hublick and the officers each have a different version of the facts that are relevant to a determination as to whether the officers' use of force against Hublick was reasonable. Whether the officers acted reasonably depends on whose version of the facts is accepted. Because "[e]ach defendant's liability must be assessed individually, based on his or her own actions," the Court will consider the actions of each individual officer in turn. *Dorsey v. Barber*, 517 F.3d 389, 399 n. 4 (6th Cir.2008).

- 9 -

**ii**

First, there is a factual dispute as to what Hublick was doing in his cell immediately prior to Officer Pandell removing him.  Hublick asserts—and Officer Hilley agrees—that Hublick was sitting on his bunk watching television.   Hilley 23.   In contrast, Officer Pandell asserts that Hublick was "agitated" and "pacing."   Officer Hogle supports Officer Pandell's description, claiming that Hublick was "throwing his arms around, yelling, hollering and bent out of shape." Hogle 33. The factual determination of whether Hublick was calm or agitated will affect the determination of whether the Defendant Officers' actions were reasonable. *See Drummer*, 75 F. Supp. 2d at 796 (Officer's use of stun gun not unreasonable considering the inmate's escalating and violent behavior).

There is also a factual dispute as to how Hublick was removed from his cell.  Hublick asserts that Officer Pandell placed him in a chokehold and physically removed him from his cell. Officers Pandell and Hilley, however, maintain that Pandell used an under-the-arm hold instead of a chokehold.

Construing the facts in the light most favorable to Hublick, a reasonable jury could conclude that Officer Pandell's forcible removal of Hublick was objectively unreasonable. Given the genuine disputes of material fact regarding Officer Pandell's removal of Hublick from his cell in a chokehold, Pandell is denied summary judgment on Hublick's excessive force claims.

**iii**

In addition to the factual disputes regarding the removal of Hublick from his cell, there is also a dispute as to what occurred immediately before, during, and after the tasings.   Hublick claims that, after the first tase, he lost consciousness.  Officers Pandell and Hilley maintain that

Hublick never lost consciousness and continued talking between the tases. Resp. Ex. B at 34, Resp. Ex. C at 26. There is a clearly established line of authority prohibiting the gratuitous use of nonlethal, temporarily disabling force when a person is no longer resisting. *See Lustig*, 211 F. App'x at 371-72 (holding that it is objectively unreasonable for officers to cause pain to a nonviolent, passively resistant detainee).  Assuming that Hublick did indeed lose consciousness after the first tase and therefore was not resisting, a reasonable jury could conclude that Officer Hilley's second tase was objectively unreasonable and unlawful under the circumstances.

There is also conflicting reports as to whether Officer Hilley warned Hublick that he was about to be tased.  Officer Hilley acknowledges that it is standard procedure to provide warnings to inmates before tasing them, and Hilley asserts that he provided the standard warning.  Officer Hogle also claims to have heard Hilley provide a warning to Hublick.

Hublick claims that he did not receive any taser warnings.  He claims instead that Officer Hilley threatened to "light him up" if he continued to passively resist. Such a remark, if actually made, could give rise to an inference of maliciousness. *See Whitely*, 475 U.S. at 312 (officers may not "maliciously and sadistically cause harm").

Construing the facts in the light most favorable to Hublick, a reasonable jury could conclude that Officer Hilley tased Hublick gratuitously and unreasonably.  Again, given the genuine disputes of material fact regarding Officer Hilley's tasing of Hublick, Hilley is denied summary judgment on Hublick's excessive force claims.

**iv**

Although Officer Hogle and Pandell did not actively participate in the tasing, Hublick claims that they are liable for failing to intervene to prevent Hilley from tasing him.  The Sixth Circuit has held that a police officer who fails to act to intervene may still be liable.  *Floyd v.*

*City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008).  Liability for failure to prevent the use of force only attaches when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Id*.  Thus, an officer who declines to intervene when the law imposes a duty to intervene may be liable for her inaction.  *Bruner*, 684 F.2d at 426.  However, the Sixth Circuit has made clear that "officers cannot be held liable under this theory if they do not have a realistic opportunity to intervene and prevent harm."  *Wells v. City of Dearborn Heights*, 2013 WL 4504759 at *6 (6th Cir. Aug. 26, 2013) (quoting *Ontha v. Rutherford Cnty., Tenn.*, 222 F. App'x 498, 507 (6th Cir. 2007).

Here, Hublick has established a prima facie case that Officers Hogle and Pandell violated his right to be free from excessive force because they did not stop Officer Hilley from tasing Hublick.  Hogle and Pandell both observed Hilley place his taser on Hublick while he was sitting on the ground outside his cell.  Hilley estimated that he had the taser on Hublick for about thirty seconds before actually tasing him; Hilley insists that he provided repeated warnings that he would taser Hublick if he moved or refused to get into the restraint chair.  Resp. Ex. C at 27, 31.  The underlying episode of excessive force—Hilley's use of the taser on Hublick—spanned a sufficient period of time for Officers Hogle and Pandell to perceive what was happening and intercede to stop it.  Hogle admits that, although she was only 6-8 feet away and could see that Hilley had placed the taser on Hublick, she did not try to stop or discourage Hilley from tasing Hublick.

Furthermore, there is a dispute regarding the length of time between the first and second tasing.  If, as Hublick contends, he passed out from the first tase and Hilley waited for him to recover consciousness before tasing him a second time, then there may have been enough time

for Officers Hogle and Pandell to intervene.  Although Defendant Officers contend that Hublick did not lose consciousness, there is a genuine issue of material fact regarding whether Hogle and Pandell could have intervened.  Based on this evidence, construed in Hublick's favor, the Court denies Defendant Hogle's and Pandell's motion for summary judgment on the basis of qualified immunity for failure to intervene.

**v**

In sum, there are several disputes of material fact regarding the Defendant Officers' forcible removal and tasing of Hublick.  When a genuine issue of fact exists as to whether an officer used force that was objectively reasonable, a court may not grant the officer qualified immunity. *Kostrzewa*, 247 F.3d at 642-43. Therefore, Defendants Pandell, Hilley, and Hogle's claims for the affirmative defense of qualified immunity are denied.

**C**

Hublick's final claim against Defendant Officers alleges that they were grossly negligent under Michigan state law.  Michigan law offers government employees immunity from tort liability under certain circumstances.  Mich. Comp. Laws § 691.1407(2).  Defendant Officers are immune from liability if: (1) they acted or reasonably believed they acted within the scope of their employment, (2) engaged in the discharge of a government function, and (3) their "conduct [did] not amount to gross negligence that [was] the proximate cause of the injury or damage." *Id.*  Therefore, Hublick must provide sufficient evidence that a reasonable jury could conclude that Defendant Officers were grossly negligent, proximately causing Hublick injury.

While the federal standard for deliberate indifference appears to be similar to Michigan's standard for gross negligence, the Sixth Circuit has clarified that they are different. *See Jones*, 625 F.3d at 947.  Specifically, federal deliberate indifference is "akin to criminal recklessness," a

very high standard of culpability that exceeds the gross negligence standard under Michigan law. *Id*.

As explained above in the federal claims section, Hublick has produced evidence from which a reasonable juror could conclude that Defendant Officers were deliberately indifferent to Hublick's constitutional rights. And because the federal standard for deliberate indifference requires greater culpability than Michigan's standard for gross negligence, the Court finds that there is sufficient evidence from which a reasonable juror could conclude that Defendant Officers were grossly negligent. Therefore, Defendant Officers are not entitled to state immunity from Hublick's gross negligence claims.

The Defendant Officers' motion for summary judgment regarding Hublick's state-law gross negligence claims rely on the same disputed facts as the qualified immunity claims. *See* MSJ at 25 ("The individual Defendants rely upon the analysis and argument set forth above in their assertion of qualified immunity in support of their defense that they did not act with gross negligence.). Having determined that genuine issues of material fact remain concerning Defendant Officials' qualified immunity claims, summary judgment is also improper on Hublick's gross negligence claims. *Younes v. Pellerito*, 2014 WL 67343, at *5 (6th Cir. Jan. 9, 2014).

**D**

Hublick sued Officers Pandell, Hilley, and Hogle in both their individual and official capacities. As described above, Defendant Officers are not entitled to qualified immunity from Hublick's claims against them in an individual capacity. However, "[i]ndividuals sued in their official capacities stand in the shoes of the entity they represent." *Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003). "A suit against an individual in his official capacity is the equivalent of a

suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).

As long as the governmental entity receives notice and an opportunity to respond, an official-capacity suit "imposes liability on the entity that he represents." *Baar v. Jefferson Bd. of Educ.*,476 F. App'x 621, 635 (6th Cir. 2012).

Defendant Officers argue—and Hublick concurs—that the claims against the Defendant Officers in their official capacity are duplicative because Otsego County is a Defendant in the action. Pl.'s Mot. Summ. J. at 9, ECF No. 31; Resp. at 9. The Court agrees, and Hublick's claims against Defendants Pandell, Hilley, and Hogle in their official capacities will be dismissed.

## IV

Turning now to Hublick's claims for municipal liability, Hublick asserts that Otsego County is liable for his injuries because it: (1) maintained a facially unconstitutional taser policy; (2) failed to train prison personnel; and (3) failed to supervise its officers to ensure that illegal and excessive force is not used. Compl. ¶ 43.

Under *Monell*, a local government can be sued directly for the unconstitutional actions of its employees when those actions occurred as a result of a municipal policy or custom. *Burgess*, 735 F.3d at 478 (citing *Monell v. Dep't of Soc. Srvs.*, 436 U.S. 658, 694, (1978)). When a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 398 (1997). There must be a "causal link" between Otsego County's policy or custom and the violation of Hublick's constitutional rights. *Cummings v. City of Akron*, 418 F.3d 676, 684–85 (6th Cir.2005). Therefore, the first step in the

- 15 -

*Monell* analysis is to determine whether Defendant Officers violated Hublick's constitutional rights. *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the [governmental] defendants cannot be held liable under § 1983.")

As explained above, there are factual disputes surrounding Defendant Officers' actions, and therefore the Court cannot determine as a matter of law that Defendant Officers did or did not violate Hublick's constitutional rights. For the purpose of analyzing whether Otsego County is entitled to summary judgment on Hublick's *Monell* claims, however, the Court will assume that Defendant Officers' conduct violated Hublick's constitutional rights and that Defendant Officers are not entitled to qualified immunity.

**A**

Hublick first claims that Otsego County maintained a facially unconstitutional policy allowing officers to tase verbally non-compliant inmates. Defs.' Mot. Summ. J. Ex. F at 9. A plaintiff may only hold a local government entity liable under § 1983 for the entity's own wrongdoing. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006). A local government entity violates § 1983 where its official policy or custom actually serves to deprive an individual of his or her constitutional rights. *Id.* A city's custom or policy can be unconstitutional in two ways: (1) it is facially unconstitutional as written or articulated, or (2) it is facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers. *Id.* If a plaintiff presents evidence of a written policy unconstitutional on its face, then the plaintiff need not present evidence of a pattern of complaints consistent with his own. *Id.* at 755. Here, Otsego County's written policy allowing officers to tase verbally non-compliant inmates is a form of direct evidence of a custom

or practice, obviating the need for circumstantial evidence of a custom or practice.  Resp. Ex. F at 9.

The use of a taser is not improper per se in the prison context.  *Caldwell v. Moore*, 968 F.2d 595, 600 (6th Cir. 1992).  Using a taser is permissible when resort to even greater force may be necessary.  *Id.* (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-45 (6th Cir. 1992)).  Although the use of a taser is not a per se violation of a prisoner's Eighth Amendment rights, the Sixth Circuit requires an inquiry into each situation to determine whether force was applied "in a good faith  effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id*.  The Sixth Circuit has emphasized that the use of tasers must be evaluated under all the circumstances.  *Id.*; *see also Michenfelder*, 860 F.2d at 336; *Soto*, 744 F.2d at 1270.   Sixth Circuit precedent makes it clear that a failure to consider the totality of the circumstances, and the indiscriminate use of tasers, could result in violations of prisoners' constitutional right to be free from excessive force.

The policy of permitting the tasing of inmates who are verbally non-compliant—but not actively resisting or putting officers in danger—without consideration of the circumstances has the "highly predictable consequences" of resulting in constitutional violations.  *See Brown*, 520 U.S. at 409.  A municipality with a custom or practice of permitting tasing of verbally non-compliant inmates therefore opens itself up to § 1983 liability.

Here, a reasonable jury could conclude that Otsego County had a custom or practice allowing officers to tase verbally  non-compliant inmates without consideration of the constitutional implications, and thus that Otsego County was "deliberately indifferent" to the rights of its citizens.  Accordingly, summary judgment is denied on this issue.[2]

---

[2] Hublick notes that after he was tased, Otsego County changed its taser policy: now, a taser can "no longer be used for verbal non-compliance, it would have to be for active resistance."  Resp. Ex. E at 22.  Hublick asserts that this

**B**

Hublick next claims that Otsego County failed to provide adequate training to its officers regarding the use of force. Otsego County can be held liable if Hublick's injuries can be attributed to Otsego County's failure to adequately train the Defendant Officers and this failure amounted to "deliberate indifference" to the rights of members of the public. *See City of Canton*, 489 U.S. at 388. Specifically, Hublick must prove three elements: (1) that the training program at issue is inadequate to the tasks that officers must perform; (2) that the inadequacy is the result of Otsego County's deliberate indifference; and (3) that the inadequacy is closely related to or actually caused Hublick's injury. *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992).

As to the first element, Otsego County has proffered uncontroverted evidence that it provided annual training regarding the use of force. Resp. Ex. E at 7. Each year, Otsego County provides live, in-person training on the use of force that includes more specific training regarding the use of tasers. *Id*. Notably, Hublick does not allege that this annual training is inadequate.

As to the second element, Hublick has not proffered evidence that Otsego County's training program was so inadequate as to amount to deliberate indifference. The Supreme Court has held that deliberate indifference sufficient to establish municipal liability rarely can be found on the basis of a single incident. *Connick v. Thompson*, 131 S. Ct. 1350, 1358 (2011). "A

---

subsequent change in policy indicates that the original policy allowing verbally non-compliant inmates to be tased was unconstitutional. The Court did not consider this argument in deciding Defendants' motion for summary judgment, however, because it is not clear that such evidence would be admissible at trial. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997) ("evidence submitted in opposition to a motion for summary judgment must be admissible"). Under Federal Rule of Evidence 407, evidence of subsequent remedial measures that would have "made the injury or harm less likely to occur . . . is not admissible to prove negligence [or] culpable conduct." Fed. R. Evid. 407. Evidence of a subsequent policy change, as here, is inadmissible evidence of culpability. *See Rush v. Pepperidge Farms, Inc.*, 2003 WL 151229, at *1 n. 1 (N.D. Ohio Jan. 6, 2003). Because evidence of Otsego County's policy change would not be admissible at trial, the Court did not consider the evidence on Defendants' motion for summary judgment. Even without considering the subsequent policy change, Hublick has proffered enough evidence to survive Defendants' motion for summary judgment on the issue.

pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id*. at 1360.

The record is devoid of any evidence of prior misuses of tasers that could be deemed to have put Otsego County on notice of any deficiency in training.  Hublick has not even alleged that Otsego County ignored a history of excessive force, and not one of the Defendants has ever been sued for excessive force. *See* Resp. Ex. B at 6; Ex. C at 3; Ex. D at 6-7.  For liability to attach in the instance of a single violation, the record must show "a complete failure to train the police force, training that is so reckless or grossly negligent that future police misconduct is almost inevitable or would be properly characterized as substantially certain to result." *Harvey v. Campbell Cnty., Tenn.*, 453 F. App'x 557, 567 (6th Cir. 2011) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982) (internal quotation marks omitted).

As noted above, Otsego County did not "completely fail to train" its officers in use of tasers, and the annual taser training was not so inadequate that officer misconduct was substantially certain to result.  It is not reasonable to draw inferences of inadequate training, deliberate indifference, and causal effect from the mere fact that, given the training he had, Officer Hilley tased Hublick.  Because Hublick has not put forth any evidence to support reasonable jury findings that the training program was inadequate, or that Otsego County was deliberately indifferent to the inadequacy, Defendant Otsego County is entitled to summary judgment on Hublick's failure to train claim.

## C

Hublick's final claim against Otsego County alleges that it failed to supervise prison personnel.  The Sixth Circuit has held that failure to investigate complaints or to discipline officers can give rise to section 1983 liability. *Leach v. Shelby Cty. Sheriff*, 891 F.2d 1241, 1247

(6th Cir.1989).  "[A] failure of a supervisory official to supervise, control, or train the offending individual is not actionable absent a showing that the official either encouraged or in some way directly participated in it."  *Leach*, 891 F.2d at 1246 (quoting *Hays*, 668 F.2d at 872).  The theory underlying these cases is that the municipality's failure to investigate or discipline amounts to a "ratification" of the officer's conduct.  *Dyer v. Casey*, 1995 WL 712765, at *2 (6th Cir. Dec. 4, 1995); *Thompson v. City of Cincinnati*, 2012 WL 1536977 (S.D. Ohio May 1, 2012).

The Sixth Circuit has repeatedly stated that a failure to supervise can be evidenced by knowledge of a problem and a subsequent failure to investigate and punish.  *Leach*, 891 F.2d at 1247 (finding deliberate indifference when Sheriff knew of multiple other situations involving failure to meet medical needs but failed to investigate and punish responsible employees); *Marchese v. Lucas*, 758 F.2d 181, 187-88 (6th Cir. 1985) (finding deliberate indifference evidenced by concealment of prisoner beating followed by complete failure to investigate the incident, including failure to identify perpetrators or impose any penalties or reprimands).

Here, Hublick has not alleged or provided any evidence to show that Otsego County had reason to know of the potential for a constitutional violation to occur, or that Defendant Officers' use of a taser was anything more than an outlier occurrence.  Instead, Hublick merely points to a lack of formal performance reviews for prison officials. But a failure to issue written performance evaluations does not amount to a failure to supervise under § 1983. To prevail on a failure to supervise claim, Hublick must point to evidence showing "several separate instances of the alleged rights violation," *Thomas v. City of Chattanooga*, 398 F.3d 426, 434 (6th Cir. 2005), or a "history of widespread abuse that has been ignored ," *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994). *See also Morrison v. Bd. of Trustees of Green Twp.*, 529 F. Supp. 2d 807, 825 (S.D. Ohio 2007) ("inferring a municipal-wide policy based solely on one instance of

potential misconduct runs dangerously close to the collapsing of the municipal liability standard into a simple respondeat superior standard."). Hublick has not provided sufficient evidence for a reasonable factfinder to conclude that Otsego knew of the potential for constitutional violations to occur, and therefore Otsego County is entitled to summary judgment on Hublick's failure to train claim.

### D

In conclusion, Hublick has provided sufficient evidence to survive Defendants' motion for summary judgment regarding his claim that Otsego County maintained a facially unconstitutional taser policy. However, Hublick's claims for failure to train and failure to supervise will be dismissed.

### V

Accordingly, it is **ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 31) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the claims against Defendants Pandell, Hilley, and Hogle in their official capacity are **DISMISSED**.

It is further **ORDERED** that the § 1983 claims against Defendant Otsego County for failure to train and failure to supervise are **DISMISSED**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 6, 2014

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 6, 2014.

s/Tracy A. Jacobs
TRACY A. JACOBS

---